FILED

Oct 17   2 44 PM '03

U.S. DISTRICT COURT
NEW HAVEN, CONN.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

————————————————————X
JANICE WEINBERG                          :

                    Plaintiff            :

            v.                           :        CIV NO. 302CV1242(MRK)

                                         :
CMP MEDIA INC., CMP MEDIA, LLC, and      :
ELECTRONIC ENGINEERING TIMES             :

                                         :

                    Defendants           :
————————————————————X    OCTOBER 17, 2003


PLAINTIFF'S PRELIMINARY[1] MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants have set forth a distorted concept of what constitutes copyright

infringement.  According to defendants, CMP is nothing more than a passive conduit for

_____

[1]

For the reasons set forth in plaintiff's motions Nunc Pro Tunc to Extend Time to
Resolve Outstanding Discovery Disputes and Complete Discovery (August 7, 2003),
Reply Memorandum to the same motion (September 3, 2003), and its Motion for
Extension of Time to Reply to Defendants' Motion for Summary Judgment (October 8,
2003), which have not been ruled on as of the response date to Plaintiff's Summary
Judgment Motion, plaintiff respectfully requests leave to supplement this response in
the event the Court grants plaintiff the opportunity to conduct the discovery as stated
in its August 7th and September 3rd motions.

Internet traffic; defendants act as if they did plaintiff a favor by exercising print rights to her Article on job searching. In fact, the Article was licensed by CMP under specific, clear restrictions, in the print medium only. Nevertheless, CMP posted her Articles on its EET/TechWeb websites. After objection by plaintiff, on December 24, 1997, CMP's counsel informed plaintiff's counsel that the articles were removed from the EET Website, and plaintiff accepted that representation. Nevertheless, plaintiff learned in 2001 that copies of one of her articles ("the Article") were available by hyperlinks from CMP's database to third party websites.

As shown in CMP's Local Rule 56(a)(1) Statement, ¶¶ 55-67, CMP derives income from a variety of sources[2], including sales of advertising space in its print publications "top banner" ads, "skyscraper ads", title and "bottom banner ads", as well as licenses for downloading content from its website. CMP sells advertising on its web pages.

It is undisputed that plaintiff's Article was copied by CMP and retained in CMP's data base for later distribution (viewing and downloading) by third parties. After plaintiff learned that her Article was available on defendant EET's website, plaintiff brought this action in July 2002.

---

[2]
Plaintiff has been as yet unable to determine CMP's gross revenues, pending resolution of several discovery disputes.

As shown *infra*, the defendants selective citation of applicable and the existence of numerous material facts preclude entry of summary judgment in favor of defendants.

I.      **ACTUAL DAMAGES AND PROFITS (Defs' Mem. at 13-19)**

Defendants argue (Defs' Mem. at 13) that plaintiff's claim of actual damages and profits must be dismissed because "there is absolutely no evidence that plaintiff suffered any loss or that CMP has made any profit attributable to the infringement." Defendants ignore well-established principles of copyright damages.

Plaintiff's claim for actual damages under <u>Count One</u> is predicated on the amount she should have been paid for the infringing reproduction and distribution of her work in the electronic medium, regardless of whether any third party viewed the Article (i.e., the direct infringement by Defendants).

Plaintiff's claim for actual damages under <u>Count Two</u> is based on the amount plaintiff should have received from print and electronic license fees avoided by Internet users who viewed the Article through means provided by Defendants.

Defendants characterize plaintiff's claim (Defs' Mem. at 14) as an entitlement to "the value of the imaginary license fee that an Internet user would pay to CMP for the right to view the Article online." However, under Internet copyright infringement case law, the courts have ruled that browsing — merely viewing infringing material on the Internet — constitutes an infringement. *MAI Systems Corporation v. Peak Computer, Inc.*, 999

3

F.2d 511 (9th Cir. 1993), *cert dismissed*, 510 U.S. 1033 (1994); *Intellectual Reserve, Inc. v. Lighthouse Minority, Inc.*, 75 F. Supp. 2d 1290 (D. Utah 1999), because the act of browsing entails the reproduction of a copy considered to be tangible under 17 U.S.C. Thus, even if Internet users only viewed the Article through means provided by Defendants, they infringed plaintiff's copyright. That Defendants provided such a means to Internet users to view the Article is clear (See Lundberg report, Exh. B).

Further, based on the technology by which Defendants made the Article capable of being viewed by Internet users, those users were also provided with unlimited means to reproduce it in print, in various electronic media, and to distribute it without limitation.

(a)    "Free" Samples

Defendants argue (Defs' Mem. at 14) that "Plaintiff fails to realize that CMP's TechWeb content is free." This assertion, while true, misses the point. Businesses commonly offer free services and products in the expectation that this will motivate the recipients of those items to purchase services and products. However, infringing plaintiff's article and offering it as part of a company's free sample menu does not absolve the infringer from liability. CMP's free offering of TechWeb material, including plaintiff's article, is designed to provide exposure for its products and services in a fashion no different from free offering of food samples in supermarkets to motivate customers to

4

purchase the sampled items.   If the supermarket had misappropriated the food it gives away, it would hardly be excused on the basis that it does not charge for the food.

When a viewer of TechWeb content contacts Defendants to obtain a reprint or e-print license to material Defendants have provided for free on the TechWeb site, Defendants require payment for the right to reproduce that material in the specified medium. In addition, Defendants impose restrictions on the right for which the license is granted (Exh. D).

    (b)    Whether the the Misappropriated Property Generates Profits
              For the Infringer

Courts have consistently concluded that there should be a mechanism for awarding damages to copyright owners in cases where infringers' illegal actions do not generate profits for them.  *On Davis v. The Gap*, 246 F.3d 152 (2d Cir. 2001). The rationale for employing that mechanism should be applied regardless of whether the infringer failed in an attempt to generate profits from the infringed work, or deliberately used the work in a manner not designed to generate profits.

    (c)    the Value of Use Approach as a Remedy under the Actual
              Damages Prong of 504(b)

Defendants argue that because of its marketing decision to offer TechWeb free of charge, it should be insulated from responsibility for compensating Plaintiff. "Moreover,

courts that have considered 'value of the use' as a measure of damages look to the hypothetical license fee that the defendant would pay to the plaintiff for the use of the work, not the fee that the defendant would receive from its downstream customers." (Defs' Mem. at 14-15).  Defendants misapply the value of use concept in calculating damages. In fact, awarding the plaintiff the fee the defendants receive from their "downstream" customers is entirely consistent with caselaw.

In *Sid & Marty Krofft Television Productions v. McDonald's Corporation*, 562 F. 2d 1157, 1174 (9th Cir. 1977), the Court held that  the value of use "amounts to a determination of what a willing buyer would have been reasonably required to pay to a willing seller for plaintiff's work." This is quite different from Defendants' claim of the "hypothetical license fee that the defendant would pay" to the plaintiff. Courts have not invested authority in an infringer to ascribe a value to what it has illegally taken — the cornerstone of the determination of his liability.  See also, *United States v. King Features Entertainment, Inc.*, 843 F.2d 394, 400 (9th Cir. 1988) (citing *Krofft*); *Holabird and Root Architects v. Physicians Management of Indiana*, 1995 WL 248066 (N.D. Ill. 1995).

Defendants have cited Plaintiff's statement in the limited print license agreement ("[A]t whatever point you would be interested in publishing them in the electronic medium, I would be glad to discuss that subject") in an apparent attempt to equate her willingness to discuss the subject to the granting of a license — but no license beyond that specified

6

in ¶1 of the agreement was ever granted. An infringer cannot be expected to pay the same amount as that which would have been negotiated between the parties. *Deltak, Inc. v. Advanced Systems, Inc.*, 767 F.2d at 357, 360-61 (7th Cir. 1985) ("a defendant infringer cannot expect to pay the same price in damages as it might have paid after freely negotiated bargaining, or there would be no reason scrupulously to obey the copyright law"), citing *Iowa State University Research Foundation, Inc. v. American Broadcasting Co.*, 475 F. Supp. 78, 83 (S.D.N.Y. 1979), 621 F.2d 57, 60 (2d Cir. 1980).

        (d)      What a Defendant Would Reasonably Be Required to Pay under the Value of Use Approach

In *Deltak*, the Seventh Circuit held that "the value of use approach requires a determination of the fair market value of the infringed document." 767 F.2d at 363. In dismissing plaintiff's claim on the basis that she seeks an "imaginary license," (Defs. Mem. at 15) Defendants cite *On Davis v. Gap, Inc.*, referring to Davis's claim for a license fee of $2 for each of 250,000 copies of an ad containing his infringing photograph of his jewelry as entirely speculative, and the Second Circuit's view that his claims were "wildly inflated." In *On Davis*, the plaintiff's claim was considered speculative because Gap's business model did not encompass a benchmark for determining a license. However, no such speculation is necessary here. Defendants' primary business is the marketing of its intellectual property, and it has in place a pricing structure for print and electronic

7

licenses. Exh. D contains sample print and electronic license agreements used by Defendants for single articles that had previously been offered for free on TechWeb. That Defendants charge license fees to persons who had previously viewed the articles offered for free on TechWeb underscores the TechWeb business model as one that distributes free content with the expectation that some of it will interest potential licensees, thereby generating profits.

Thus, a proper representation of the Court's opinion in *Krofft* is that use of the "fee that the defendant would receive from its downstream customers" is the proper basis for determining the fair market value of what defendants took under Count Two (Contributory Infringement) of the complaint. Accordingly, defendants' cursory dismissal of plaintiff's damages claim is wholly misplaced.

(e)    Evidence Supports Plaintiff's Claim That Defendants
         Derived Direct Profits From the Article

Defendants cite *Mackie v. Rieser*, 196 F. 3d 909 (9th Cir. 2002) in claiming that "a successful plaintiff is only entitled to profits that are attributable to the infringement." But that case dealt only with indirect - not direct - profits, i.e., the plaintiff sought profits derived from concerts promoted by a brochure displaying an infringing design on its cover. Here, there is compelling evidence that the Article did, in fact, generate direct profits, including:

1.   The placement of ads adjacent to the Article, which were always visible to plaintiff and other witnesses when they assessed the Article (Exhs. E-1 and E-2 of the Complaint);

2.   Defendants' published advertising rates for TechWeb, showing that they are based on page views (Exh. F).

3.   In Thor Lundberg's analysis (Exh. B at 5-7) of the source code for the web page containing the Article, he concluded that "...the claim that *CMP has not profited* from the Article would only be true if no one ever viewed the Article."

In Robert Koshar's Declaration, he states that the delivery of ads shown adjacent to the Article was completely random, and that no advertiser specifies content where their ads should be placed. Defendants have attempted to use their advertising allocation practice to disavow knowledge of specific displays of ads adjacent to the Article and, therefore, the ability to know how many page views were reflected in their invoices to advertisers whose ads were displayed adjacent to the Article. However, The Copyright Act protects plaintiffs from being penalized by accounting systems of infringers that fail to isolate infringing from non-infringing profits. § 504(b), provides: "In establishing the infringer's profits, the copyright owner is required to present proof of the infringer's gross revenue, and the infringer is required to prove his or deductible expenses and the

elements of profits attributable to factors other than the copyrighted work." This burden-shifting requirement is the bedrock foundation of the statute's imposition of responsibility on an infringer and is supported by case law, including: *Harper & Row v. Nation Enterprises*, 471 U.S. 539 (1985) ("With respect to apportionment of profits flowing from a copyright infringement, this Court has held that an infringer who commingles infringing and noninfringing elements must abide the consequences, unless he can make a separation of the profits so as to assure to the injured party all that justly belongs to him."), citing *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 406 (1940); *Three Boys Music Corporation v. Michael Bolton*, 212 F. 3d 477, 487 (9th Cir. 2000) ("the statutory burden of proof lies with [defendant] to prove what percentage of their profits were not attributable to copying the [song in question]; *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505 (9th Cir. 1985). ("The burden of proving apportionment [i.e., the contribution to profits of elements other than the infringed property], is the defendant's.").

Defendants attempt to further dissociate themselves from any knowledge of profits attributable to ads next to the Article by claiming that they have no way of knowing whether these ads were bonus ads. However, bonus ads constitute value to advertisers and must be construed as enhancing Defendants' relationship with its advertisers, further contributing to its brand and, therefore, future profits.

10

## II.    WHETHER CMP HAS DIRECTLY INFRINGED PLAINTIFF'S COPYRIGHT (Defs' Mem. at 19-22)

Defendants argue that plaintiff lacks evidence to support either direct or contributory infringement.  The record shows otherwise.

Plaintiff alleges direct infringement based on Defendants' server creating a copy in its Random Access Memory ("RAM") each time a request for the Article was made by an Internet user, and distributing that copy.  As shown in the Lundberg Report (Exh. B at 4, §§ 3-4), Defendants' server made a RAM copy and "for the data to be sent to the web browser, it has to be read from the memory of the web server and sent - effectively making another copy." An unauthorized RAM copy has been held to be an infringement, *MAI Systems Corporation,* 991 F.2d 511.

See also, *A Report of the Register of Copyrights Pursuant to Section 104 of the Digital Millennium Copyright Act* (U.S. Copyright Office, August 2001, available at http:11www.loc.gov/copyright/reports/studies/dmca/dmca_study.html) (the making of temporary copies of a work in a RAM implicates the reproduction rights so long as the reproduction persists long enough to be perceived, copied or communicated).

The fact that the Article was viewable through the actions described above, which were fully under the control of Defendants' server, is evidence of Plaintiff's direct

11

infringement.  As will be detailed  *infra*, those actions provided the means by which persons other than Plaintiff and her witnesses were able to infringe her work.

To prove a direct infringement, a plaintiff must show:

(a)     a properly registered copyright certificate,

(b)     access to the work by the defendant, and

(c)     that the defendant violated one of the exclusive rights of the copyright holder.

Defendants reproduced the Article in violation of an agreement that expressly authorized one-time use in the print media only.  Case law holds that exceeding the scope of a license is in an infringement.  Therefore, Defendants are liable for directly infringing the Plaintiff's copyright.

*S.O.S., Inc. V. Payday, Inc.*, 886 F.2d, 1081 (9th Cir., 1989) (licensee infringed owner's copyright when licensee's use exceeded scope of license).     citing *Gilliam v. American Broadcasting Cos.,*  538 F.2d 14 (2d Cir. 1976); *Sun Microsystems, Inc. V. Microsoft*, 21 F. Supp. 2d 1109 (N.D. Cal. 1998) (citing     *S.O.S., Inc.* in issuing a preliminary injunction against Microsoft for violating a license agreement).

12

III.    **WHETHER CMP IS LIABLE AS A DIRECT INFRINGER FOR THE UNAUTHORIZED HYPERLINKING OF THIRD PARTIES (Defs' Mem. at 20-22)**

CMP is attempting to disguise itself as an "entirely passive" Internet Service Provider (ISP), which merely provides access to the Internet. These cases cited by defendants (Defs' Mem. at 21) involved ISP providers - Netcom, Robertson (AOL), RemreiQComtys, Inc. The fourth defendant (Sabella) operated an Internet bulletin board.

CMP is the antithesis of an ISP, and it is not protected as one under the Digital Millennium Copyright Act. CMP is a content packager which totally controls the content of its websites.

However, even though Defendants cannot evade liability by attempting to cloak itself in the mantel of an ISP, this is irrelevant to proving their liability for direct infringement. Plaintiff's claim against Defendants is not predicated on proving their liability for the unauthorized hyperlinking of thir parties, but by proving that they have violated her copyright by creating unauthorized copies of the Article in the RAM of a server under their control, and distributing those copies.

IV.    **PLAINTIFF'S CONTRIBUTORY INFRINGEMENT CLAIM (Defs' Mem. at 22-28)**

Defendants' "who-me?" argument, while predictable, is unavailing. As shown supra, CMP reproduced and distributed the Article. Plaintiff need not prove CMP's "knowledge" of the hyperlinks on Galaxy or Wood West, or that anyone could or had used

13

these hyperlinks - - the Article was viewable by Internet users irrespective of whether those users were Plaintiff and her witnesses, or others. And, the means by which viewability was provided was Defendants' reproduction and distribution of the Article from a server under its control. Contributory liability will be established where the defendant, "with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Gershwin Publishing Corp. V. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971). Defendants received knowledge of Plaintiff's proprietary right three times - the latter two advising them of their direct infringement. Since constructive knowledge of an infringement is the threshold for liability for contributory infringement, Defendants' argument that they "unknowingly provided the means by which others might have infringed (Defs' Mem. at 22) should be rejected. CMP's material contribution to the direct infringement of others is demonstrated by their server's creating RAM copies of the Article, as well as distributing those copies.

A.    **Whether Plaintiff Can Prove Direct Infringement**

Defendants argue (Defs. Mem. at 23) that, "CMP's web logs contain no evidence that anyone ever viewed the Article stored in CMP's database." In fact, Defendants' web logs, as provided in discovery to plaintiff and contained in Exh. A of the Kates Declaration, show that the Article was successfully delivered in response to Internet

14

users, as detailed in the Lundberg affidavit (Exh. C).  Exh. A of the Kates declaration shows that third parties other than plaintiff and her witnesses viewed the Article.

**(1)    Whether Plaintiff Can Infringe Her Own Copyright (Defs' Mem. at 23)**

Plaintiff could view the Article on the Internet because defendants' created a RAM copy and distributed it (creating a second copy, as per the Lundberg Report, Exh. B, at 3-4).  Thus, a viewing of the Article *by the plaintiff* could not have occurred without a prior direct infringement by defendants.

**(2)    Whether Plaintiff's Third-Party Witnesses Have Not Directly Infringed Because They are Licensed by Plaintiff (Def. Mem. at 24)**

Defendants' bizarre claim that the only infringers were the persons plaintiff asked to view the Article is a makeweight attempt to deflect attention from the essential issues here.  As stated in (a), *supra*, the viewing of the Article by *Plaintiff's Third-Party Witnesses* could never have been possible if not for the direct infringement by Defendants.

Plaintiff is not premising her claim of contributory infringement on the conduct of those who acted on her behalf in accessing the Article.  As the Lundberg affidavit shows (Exh. C) plaintiff's claim of contributory infringement is premised on Defendants providing the means by which anyone could request and receive the Article from defendants' server.  Once plaintiff's Article was copied and stored on CMP's website servers, it was

15

sufficiently permanent to permit the reproduction or other communication of the work to meet 17 U.S.C. § 101's definition of "copies" ("fixed by any method...from which the work can be perceived, reproduced or otherwise communicated..."). Unauthorized copying in that format would violate plaintiff's exclusive reproduction rights. See, e.g. *UMC Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y. 2000); *Playboy Enterprises v. Frena*, 839 F. Supp. 1552, 1556 (M.D. Fla. 1993).

**B.     Whether CMP Had Knowledge of any Direct Infringement
         (Defs' Mem. at 25-26)**

Defendants argue from *Ellison,* 189 F. Supp. 2d at 105, that "[T]he Knowledge requirement means that the contributory infringer must "know or have reason to know of the direct infringement". As discussed *supra*, the direct infringement was the act of reproducing the Article in the RAM of their computer server and facilitating the distribution of copies to Internet users. Cf. *N.Y. Times v. Tasini*, 533 U.S. 483, 488, 491 (2001) (distribution right may be implicated by an electronic transmission alone).

Defendants were informed in writing in October 1996 that they had one-time non-exclusive use in the print medium only (Grayson Decl. ¶ 2, Defs' Exh. A). Defendants were informed by telephone (Plaintiff's conversation with Robert Bellinger, signatory to the license, on or about September 9, 1997) that they had directly infringed plaintiff's copyright (Compl. ¶ 11). Defendants were informed by letter from Plaintiff's counsel

16

(November 7, 1997) that they had infringed Plaintiff's copyright (Exh. F).    Accordingly, after CMP acknowledged the ownership of plaintiff's rights to the Article in writing, followed by two notices of actual knowledge of a direct infringement - including one to CMP's counsel - there is ample evidence for the requisite knowledge for contributory infringement.

### 3.    CMP's "Lack of Substantial Participation In Third Party Infringement (Defs' Mem. at 26-28)

Irrespective of defendants' protestations, it is clear that defendants provided the means by which Internet users could - and did - infringe plaintiff's Article (Exh. B at 4). Defendants' case citations ignore that defendants were provided with *three* separate notices of plaintiff's disapproval of the use of her Article in non-print format.  Defendants copied the Article and knowingly and willingly invited visitors to its web site to download the Article.  See, e.g., *Intellectual Reserve, Inc.,* 75 F. Supp. 2d at 1294-95 (defendant knew that linked sites contained infringing material).

There is no question that (i) defendants are in the business of selling intellectual property, and (ii) (unlike ISPs) defendants control the content of their own websites.

Finally, as shown by *Lundberg's Affidavit* (Exh. C) (i) the means of infringement were provided by defendants to Internet users, and (ii) the Article was provided in its complete version to users requesting it.

17

Accordingly, irrespective of Galaxy and Wood West, defendants substantially participated in the subject infringement.

## V.    PLAINTIFF'S CUTPA CLAIM (Defs' Mem. at 28-32)

Defendants argue that plaintiff's Unfair Trade Practices Act ("CUTPA") claim should be dismissed on grounds of (a) preemption, and (b) lack of ascertainable loss. Defendants also argue (c) that plaintiff's request for punitive damages must be dismissed because plaintiff cannot show that CMP acted with requisite intent.

(a) Preemption and (c) Punitive Damages.

If the Court grants plaintiff's motion to extend the discovery deadline as shown *supra*, there exists a reasonable probability that the plaintiff will have a basis to amend her complaint with respect to this CUTPA Count to allege the "extra element" of misrepresentation and/or fraud.  For example, defendants' response to plaintiff's Interrogatory No. 8 (g) (Exh. J) represented that "the Article was removed on or about August 2002." However, defendant Siegelson in his declaration, ¶ 4, states "that at Mr. Wallace's direction in or about February 2003 I completely deleted the computer file containing the Article from CMP's data base."  In addition to this inconsistency, CMP's counsel in a March 25, 2003 letter to the Court (Exh. H), stated that defendants received actual notice of the order for the preservation of the evidence on *November 4, 2002* and that "upon receiving proof of service, CMP took immediate steps to comply with the order

18

and preserve all existing electronic data relating to plaintiff's Articles."  However, the Court's Order (Exh. I) required more than merely the preservation of existing electronic data. It specifically prohibited "...defendants and their agents, employees and designees from altering, deleting, destroying, deposing or tampering with ....(a) any media or electronic information relating to any articles written by plaintiff, including, but not limited to, hard disk media, archiving media and media used for purposes of backing up electronic information for the period October 29, 1996 through January 1, 2002."

Accordingly, based on the limited information now available to plaintiff, it would appear that the "extra element" to avoid preemption exists and that plaintiff would be able to move under Rule 15 to add an element under CUTPA for deception and/or misrepresentation. For these reasons, defendants' argument with respect to preemption and punitive damages is inappropriate for summary judgment at the present stage of the pleadings.

(b)     Defendants' Assertion that Plaintiff Cannot Demonstrate
        "Ascertainable Loss".

Defendants do not set forth applicable Connecticut law on the issue of ascertainable loss.  The question of the *fact* of ascertainable loss, on the one hand, and *the estimate of damages*, on the other, are two very different issues.  Defendants also

19

ignore the remedial nature of CUTPA (Cf, *Larsen Chelsey Realty Co. v. Larsen*, 232
Conn. 480, 656 A.2d 1009, on remand 1995 WL 33152 (1995).

Contrary to defendants' assertion that a CUTPA plaintiff must demonstrate a rea-
sonable estimate of damages that have been suffered, the claimant is not required "to
prove a specific amount of actual" damages in order to make out a prima facie case .
*Hinchliffe v. American Motors Corp.,* 184 607, 612-13, 440 A.2d 810 (1981). As noted
by Justice Berdon, concurring in *Rizzo Pool Co. v. Del Grasso,* 232 Conn. 666, 657 A.2d
1087, 1098 (Conn. 1995)

> ...If, because of an unfair or deceptive trade practice, a
> person has been deprived of the item for which he had
> bargained, he or she has suffered an "ascertainable loss"
> cognizable under CUTPA.  Without showing more, that
> person is entitled to nominal damages (citing *Larsen Chelsey
> Realty*)...

Further, if a CUTPA plaintiff establishes only nominal damages, that plaintiff is entitled
to have the trial court consider both punitive damages and attorney's fees. Id. at 1098
(citing *Hinchliffe* and *Larsen*). If defendants violated the Copyright Act, this would be a
*per se* violation of CUTPA, and the actual amount of ascertainable loss need not be
proven. *Kronberg Brothers, Inc. v. Steele*, 72 Conn. App. 53, 804 A.2d 239, 244 (Conn.
App. 2002), *cert. denied*, 262 Conn. 912.

20

Accordingly, defendants' argument on ascertainable loss ignores applicable Connecticut law.  CUTPA imposes no requirement of a consumer relationship, *Larsen*, 232 Conn. at 496, 656 A.2d at 1019.  A violation of federal law in the form of copyright infringement is no less a violation of CUTPA than if defendants overcharged plaintiff for goods or services.

## VI.   PLAINTIFF'S DETRIMENTAL RELIANCE CLAIM (Defs' Mem. at 32-33)

Defendants argue that plaintiff's detrimental reliance claim should be dismissed because the subject statements of Attorney Grayson were not promises of *future actions*, but rather of a present fact that "the articles were promptly removed from the site and are no longer available".  Defendant's argument is totally misplaced.

Connecticut law on estoppel is well established:

> Any claim of estoppel is predicated on proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts *exist* and to act on that belief; and the other party must change its position in reliance on those facts thereby incurring some injury (citations omitted, emphasis added).

*O'Sullivan v. Briganty*, 214 Conn. 641, 648, 573 A.2d 729, 732 (Conn. 1990).  There is no practical difference under Connecticut law whether Attorney Grayson's letter reflected an existing fact or an intention to undertake future obligations. Her letter included

21

representations of fact that *two* actions *had occurred* prior to the submission of her letter to plaintiff's counsel:

1.    that the articles were promptly removed after plaintiff notified defendants that she had not authorized republication of these columns on EET's website (which was, in fact, the second notification of this restriction, the first having been made upon presentation of the written license agreement, signed by Robert Bellinger on October 29, 1996) (Complaint, ¶ 5); and

2.    that the articles "are no longer available", a fact justifiably presumed by plaintiff to be true at the time Attorney Grayson, an officer of the Court, signed the letter.

Accordingly, representations were made to plaintiff that certain facts existed.[3]

Defendants' assertion (Defs. Mem. at 33) that plaintiff's claim that she delayed bringing suit is "far too speculative as a matter of law" to sustain a claim of detrimental reliance is

---

[3]

Defendant's citation to *D'Ulisse-Cupo v. B. D. of Dirs. of Notre Dame High School*, 520 A.2d 217, 221-22 (Conn. 1987) is similarly misplaced. In *D'Ulisse-Cupo*, the statements which were the subject of the promissory estoppel count were "no more than representations indicating that the defendant intended to enter into another employment contract with the plaintiff at some time in the future. There is no claim that these representations were not made in good faith." Id. at 221. Here, plaintiff Weinberg complains that the subject letter from Attorney Grayson deliberately misrepresented existing facts, which have always been a basis for estoppel under Connecticut law. *O'Sullivan*, 573 A.2d at 732.

22

not supported by any factual basis.  Plaintiff had every right to expect that Attorney Grayson meant what was set forth in her letter of December 24, 1997.  The "market value" of the Article in question is addressed *supra*; the question of the "value" of that Article, in light of the various instruments available to defendants to exploit it, refutes defendants' allegation that there was no "proximate cause" of any damage.

## VII.    CONCLUSION

For the foregoing reasons, in light of the disputed issues of law and material fact, defendants' Motion for Summary Judgment should be denied.

THE PLAINTIFF
JANICE WEINBERG


By:_____
ALAN NEIGHER – Fed. ID ct-00134
BYELAS & NEIGHER
1804 Post Road East
Westport, CT 06880
203/259-0599

23

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed, first-class prepaid postage and via facsimile to Christopher J. Glancy, Esq. and Daren M. Orzechowski, Esq., White & Case, LLP, 1155 Avenue of the Americas, New York, N.Y. 10036-2787 (212/354-8113) and Joseph W. Martini, Esq., Pepe & Hazard, LLP, 30 Jelliff Lane, Southport, CT 06890 (203/259-0251) this 17th day of October, 2003.

ALAN NEIGHER

24

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

————————————————————— X

JANICE WEINBERG                                    :

                **Plaintiff**                :

    **v.**                                               :      CIV NO. 302CV1242(MRK)

CMP MEDIA INC., CMP MEDIA, LLC, and      :
ELECTRONIC ENGINEERING TIMES            :

                       :    **AFFIDAVIT OF JANICE**
                       :    **WEINBERG IN OPPOSITION**
         **Defendants**       :    **TO DEFENDANTS' MOTION**
————————————————————— X  **FOR SUMMARY JUDGMENT**

    I, JANICE WEINBERG, the plaintiff in the above-entitled action, and believing in the obligation of an oath, do hereby depose and say as follows:

    1.    I have reviewed Defendant's Local Rule 56(a)(1) (Statement of Material Facts which defendants claim are "not in dispute." I note the following.

    2.    ¶ 24 of defendants' Local Rule 56(a)(1) Statement (herein "Statement") states that in September 1997, I notified CMP that several of my Articles were available on the Internet. I alleged the same in the Complaint, ¶ 11. However, this omits the fact that I received a call from an unknown person who told me that he had found my Article on the EET Internet site. Accordingly, defendants' use of the phrase "on the Internet" is

misleading since infringing material is frequently available on the Internet. My work was not simply "available" on the Internet, but was there because of its inclusion on EET's website.

3.    With respect to ¶ 25 of defendants' Statement, Attorney Grayson informed me that the Article was on <u>EET's</u> website and not simply the Internet or TechWeb.

4.    ¶ 26 of defendants' Statements is similarly flawed, since the site referred to was "EET's Web Site" and not simply the Internet or TechWeb.

5.    ¶ 27 of defendants' Statement is similarly flawed. Attorney Grayson's Declaration ¶ 4, Exh. B, states that plaintiff's Articles had been removed from *EET's Web Site*. *No mention of TechWeb is made.*

6.    In ¶ 34 of plaintiff's Statement, defendants misrepresent my allegation of infringement, which is not that certain individuals copied or downloaded the Article in 2001. The essence of my claim of infringement is that *defendants* copied, reproduced and distributed my Article from their servers and provided the means by which others reproduced and distributed the Article, without limitation.

7.    With respect to ¶ 43 of defendants' Statement, this, too, is erroneous. Defendants asserted in writing (Grayson Declaration, Exh. B) that the Article was available on the *EET website*.

2

8.     With respect to defendants' Statement, ¶¶ 55-67, pending discovery noted in my earlier Motion to Extend, I cannot adequately respond to these paragraphs.

_____
JANICE WEINBERG

SUBSCRIBED AND SWORN TO before me this 17th day of October, 2003.

_____
Notary Public

JUNE E. MASTRONARDI
NOTARY PUBLIC
MY COMM. EXPIRES 1/31/2004

3