25 Lilac Way
Taunton, MA 02780

June 12, 2003

Alan Neigher
Attorney
1804 Post Road East
Westport, CT 06880-5683

Dear Mr. Neigher:

In response to your letter you sent to me June 2, 2003, I addressed 4 questions as follows:

Question 1 (Regarding Direct Infringement under Count One): Was the Plaintiff's Article, "Determining the Causes of an Unsuccessful Job Search" (hereinafter referred to as "the Article), reproduced, distributed and/or displayed by Defendants after they claimed in 1997 that the infringements of that and other articles of the Plaintiff had ceased and the articles were no longer available?

Question 2 (Regarding Contributory Infringement Under Count Two): If the Plaintiff's Article was reproduced, distributed and/or displayed by Defendants after they claimed to have ceased their infringements in 1997, could their use of the Article in any of those ways have provided Internet users with the means by which they could have directly infringed her copyright by reproducing, distributing and/or displaying it themselves?

Question 3 (Regarding the period of potential damages): What are the probable beginning and ending dates of the availability of the Article on techweb.com after the date the Defendants have claimed they removed the Article and it was no longer available in 1997?

Question 4: What is the validity of defendant's claim (set forth in defendants' counsel's letter of October 4, 2002 that "[i]ndeed, the single web page was buried deep in an internal CMP database..."

I note the exhibits you included with your letter, and I reviewed those exhibits (attachment A).

I am also enclosing a glossary of terms (attachment B).

I am also enclosing a copy of my latest curriculum vitae (attachment C).

The compensation to be paid to me is at a rate of $100 per hour.

I am enclosing a list of cases in which I have testified to as an expert at trial; I have not testified in depositions (attachment D).

Sincerely


Thor Lundberg

Janice Weinberg v. CMP Media Inc., et al
Civ. No. 302 CV1242 (JCH)
U.S. District Court, District of Connecticut
Report -- Thor Lundberg

### Addressing Direct Infringement under Count One

**Was the Plaintiff's Article, "Determining the Causes of an Unsuccessful Job Search" (herein after referred to as "the Article"), reproduced, distributed, and/or displayed by Defendants after they claimed in 1997 that the infringements of that and other articles of the Plaintiff had ceased and the articles were no longer available?**

In determining whether or not the article was displayed and distributed by the Defendants after September 1997, I have to rely on the evidence gathered by others before I became involved with this case on January 25, 2002, after the last known claims of dissemination of the article via the Internet.

### On the question of display of the content

To answer the question of display, the evidence gathered which I rely on specifically is listed as follows:

| | |
|---|---|
| Exhibit A – | A table describing the images and text adjacent to the first page of the Article |
| Exhibit C-1 – | The screen shot of the Article taken on July 10, 2001 |
| Exhibit C-2 – | The source code for the Article in Exhibit C-1 |
| Exhibit D – | Judith Elmendorf's affidavit, affirming having seen the article on June 12, 2001 |
| Exhibit E – | Edwin H. Fraumann's affidavit, affirming having seen the Article on June 27, 2001, July 6, 2001, and July 13, 2001 |
| Exhibit K – | Moses Reynolds' affidavit, affirming having seen the Article on eight separate occasions between the dates of July 3, 2001 and November 1, 2001 |
| Exhibit M – | Printout of the Article taken September 25, 1997 |

I first had to consider the possibility that the affiants were all observing *cached* information, old copies of the Article stuck in memory on systems not directly related to the CMP Media *website*, or locally stored in the *Browser Cache*.

When a user communicates with an Internet *web server* using a *web browser*, all documents retrieved from the *Internet* are first stored, typically, on the disk drive inside the user's computer in a special directory called the Browser Cache. Once the document is saved to the Browser Cache, the document the user requested is then displayed to the user.

When a request for the exact same document is made again to the same web server, many web browsers will first check the contents of the Browser Cache to see if the document being requested exists before making a request to the Internet web server. If the browser finds the document in the Browser Cache, it may display that document to the user instead of requesting a new copy from the Internet web server.

For the Browser Cache to become populated with a document, it has to initially be requested. Subsequent requests for the same document from the same Internet server may then and only then display a local copy of the document instead of displaying a copy from an Internet server.

According to the listed affidavits in Exhibits D, E and K, there is no indication that each of the affiants had opportunity to view the article online prior to the dates mentioned in each affidavit, thereby populating the Browser Cache with older copies of the Article. It stands to reason, that the Browser Cache for each user was not a factor to discredit the claim that each affiant was observing a current copy of the Article on the CMP Media website.

Caching of documents on the Internet is commonly done using a technology called a *Proxy server*. Basically, such caching servers stand "in the middle" between a user who is requesting a document from an

**Janice Weinberg v. CMP Media Inc., et al**
**Civ. No. 302 CV1242 (JCH)**
**U.S. District Court, District of Connecticut**

Internet server and the Internet server holding the document. What can happen is when a user requests a document from an Internet server, the Proxy server will intercept the request for the document and check its own memory to see if it has a copy already stored. If the server finds a copy of the document being requested, it may send the document it has back to the user instead of requesting the Internet server for a fresh copy.

Like the Browser Cache, the document stored on a caching server has to be requested initially prior to being stored in its memory. Further, any document so stored in the memory of a caching server can expire – effectively being deleted from the memory of the server.

There are many ways a document can be deleted from a caching server's memory system. First, it can be done programmatically – through special *HTML* data that tells a document to either "not be stored in the memory of the caching server" or "expire on a certain date/time/duration". Another way a document can be deleted from a caching server is when the server's memory "fills up" and has to "remove the document" to make room for other documents. Further, the caching server process can be stopped and restarted, effectively eradicating all stored documents from the server's memory system.

According to the listed affidavits in Exhibits D, E and K, it is not known whether or not each user was connected to a caching server in order to view the Article on the CMP Media website. Further, without knowing the specifics of the maintenance or configuration of any alleged caching servers, it does not follow logically that the documents viewed by each affiant were actually documents presented to them as a result of being in a caching server's memory for months or years.

Caching servers, just like any computer technology, require periodic maintenance, and hence, require being restarted, which would erase documents stored in the server's memory. Also, caching servers would likely undergo periodic upgrades – using different hardware and/or software, a process that also could eradicate documents from the server's memory system. Lastly, given the amount of activity a caching server could experience between September 1997 and the dates provided by each affiant, the caching server processes would have likely purged the Article at least once from its own memory. Each affiant's claim that they saw the Article on the CMP Media website is logically supported.

There were three websites that also bear testimony to the existence of the Article on the CMP Media website after 1997.

A research website called (archive.org) "The Wayback Machine" allows an Internet user to look at websites on the Internet the way they were some years ago. I attempted to use the Wayback Machine to look at the CMP Media website the way it was for several months in the years 1997, 1998, 1999, 2000, and 2001, hoping to substantiate claims regarding the display of the Article. I was not successful. CMP Media had implemented a standard technology on their web servers as far back as 1997 that prevented the Wayback Machine from being able to gather information it required for population of its database.

However, the Wayback Machine was able to gather information about other websites that linked to the Article on the CMP Media website.

The website, www.bway.net, displayed a document titled "hotlist.htm", located at www.bway.net/galaxy/hotlist.htm, having a *hyperlink* to the Article on the CMP Media website. The document having a hyperlink to the Article stated it was modified on May 15, 1998. Documents first started appearing for www.bway.net in the Wayback Machine's database on December 3, 1998. Documents first started appearing for www.bway.net/galaxy/ in the Wayback Machine's database on December 3, 1998. The first time www.bway.net/galaxy/hotlist.htm was entered into the Wayback Machine's database was February 2, 1999.

The hyperlink referenced "http://www.techweb.com/se/directlink.cgi?EET19970428S0008" in the hotlist.htm document is the link to the Article.

Janice Weinberg v. CMP Media Inc., et al
Civ. No. 302 CV1242 (JCH)
U.S. District Court, District of Connecticut


It is likely that the author of the document "hotlist.htm" created that document and verified all the hyperlinks the document contained on or before May 15, 1998. This suggests the probability that the hyperlink to the article titled "Determining the Causes of an Unsuccessful Job Search" was valid at that time.

The website www.galaxymgt.com, displayed a document titled "CareerStrategies.cfm", located at galaxymgt.com/CFPages/CareerStrategies.cfm, having a hyperlink to the Article on the CMP Media website. Documents first started appearing for galaxymgt.com in the Wayback Machine's database on December 4, 1996. Documents first started appearing for galaxymgt.com/CFPages/ in the Wayback Machine's database on August 21, 1999. The first time galaxymgt.com/CFPages/CareerStrategies.cfm was entered into the Wayback Machine's database was December 6, 1999.

The hyperlink referenced "http://www.techweb.com/se/directlink.cgi?EET19970428S0008" in the CareerStrategies.cfm document is the link to the Article.

It is likely that the author of the document "CareerStrategies.cfm" created that document and verified all the hyperlinks the document contained on or before December 6, 1999. This suggests the probability that the hyperlink to the article titled "Determining the Causes of an Unsuccessful Job Search" was valid at that time.

The website www.wood-west.com, displayed a document titled "news.html", located at www.wood-west.com/news.html, having a hyperlink to the Article on the CMP Media website. Documents first started appearing for wood-west.com in the Wayback Machine's database on December 12, 1998. The first time www.wood-west.com/news.html was entered into the Wayback Machine's database was February 2, 1999.

The hyperlink referenced "http://www.techweb.com/se/directlink.cgi?EET19970428S0008" in the news.html document is the link to the Article.

It is likely that the author of the document "news.html" created that document and verified all the hyperlinks the document contained on or before February 2, 1999. This suggests the probability that the hyperlink to the article titled "Determining the Causes of an Unsuccessful Job Search" was valid at that time.

On February 20, 2002, I had a brief conversation with Alexis Rossi, technical supporter of the Internet Archive (the Wayback Machine). Alexis stated that they catalogue and store data from websites every two months, popular sites being catalogued more often, less popular sites being catalogued less often. What this means, by example, is that the Wayback Machine knew about documents on the www.wood-west.com web server as early as December 12, 1998, but did not find the file "news.html". The Wayback Machine later found the file "news.html" on February 2, 1999. Based on my discussion with Alexis, I can reasonably conclude that the file "news.html" was new on the www.wood-west.com web server sometime between December 12, 1998 and February 2, 1999.

### On the question of distribution and reproduction of content

Because a user on the Internet could view the Article directly from the CMP Media web server, distribution and reproduction of the content of the Article most certainly have transpired.

Whenever an Internet user entered the *URL* http://www.techweb.com/se/directlink.cgi?EET19970428S0008 into their web browser, the web browser would look for web servers having the address called www.techweb.com. Like a person using a telephone, if the web server was waiting for a connection, it would respond with a "hello" to the web browser. From there, the web browser and web server would begin two-way communication.

The web browser then would ask for a document called "/se/directlink.cgi?EET19970428S0008", the exact reference that was tied to the online article titled "Determining the Causes of an Unsuccessful Job Search". The web server would tell the web browser to wait while the server retrieved the requested information.

Janice Weinberg v. CMP Media Inc., et al
Civ. No. 302 CV1242 (JCH)
U.S. District Court, District of Connecticut

If the document was disabled or not existing on the web server, the file "directlink.cgi" would possibly do something special, such as tell the web browser that the document was disabled, not found, or send the web browser to some other place on the www.techweb.com web server. However, if the information is found, the next steps in the delivery process begin.

Upon finding the document (the Article), the server makes a copy of the information and places it into the memory of the web server (*RAM*). While in memory, the document is a complete and valid copy from its source, whether from a file on disk, or from data contained in a database.

Once the information is stored in RAM, the information is then sent via the communication pathways connecting the web server with the web browser. Again, for the data to be sent to the web browser, it has to be read from the memory of the web server and sent – effectively making another copy. When the sending of the data to the web browser is complete, computer processes often delete the copy that was in the memory of the web server automatically. However, residual copies of the document that was in memory of the web server could exist still for some time in various places on the web server's disk system.

However, the web browser that made the request for the Article then has a complete and exact duplicate of the copy that exists on the CMP Media web server, stored in the cache of the browser. This copy may stay in the Browser Cache for any length of time, from a few minutes, to years. Further, this copy is easily replicated and distributed beyond the Browser Cache via processes addressed in the next question.

### Addressing Contributory Infringement Under Count Two

**If the Plaintiff's Article was reproduced, distributed and/or displayed by Defendants after they claimed to have ceased their infringements in 1997, could their use of the Article in any of those ways have provided Internet users with the means by which they could have directly infringed her copyright by reproducing, distributing, and/or displaying it themselves?**

If the Article was being displayed by the CMP Media website, and steps to protect web documents were not taken by CMP Media, Internet users could fully and completely infringe the copyright of the Plaintiff. Examples of such are as follows:

### A. Users could reproduce in electronic form without limitation

Because a complete copy of the Article is stored in the Browser Cache of the Internet user, that copy may then be renamed as any number of different computer file names, copied again, renamed, etc.. ad infinitum. The copy may also be easily duplicated to removable disk media, such as floppy disk, ZIP or JAZ drive, or writeable CD or DVD technology, or distributed to a connected *network* resource. Further the copy may be distributed completely intact to a *PDA* or other handheld type electronic device.

### B. Users could reproduce in print form without limitation

The contents of the copy in the Browser Cache may also be duplicated via being printed out using a computer printer, in hard copy format. From there, that printout copy may be further duplicated using conventional document duplication methodologies (fax, Xerox, file scanners – as examples).

### C. Users could distribute electronically without limitation

The copy existing in the Browser Cache may also be distributed using many types of electronic information sharing methodologies. The file may be distributed again to other users on the Internet by using *E-mail*, *FTP*, private file-sharing networks like *Napster*, *Grokster* or *Morpheus*, or published again up on a *personal website*, a common offering many *ISPs* offer their customers, to again, repeat the distribution paradigm via the Internet.

Janice Weinberg v. CMP Media Inc., et al
Civ. No. 302 CV1242 (JCH)
U.S. District Court, District of Connecticut

### Addressing the period of potential damages

**What are the probable beginning and ending dates of the availability of the Article on techweb.com after the date the Defendants have claimed they removed the Article and it was no longer available in 1997?**

There is the probability that the Article appeared again on the Internet at or around the time of May 15, 1998 lasting through November 2001, per section "On the question of display of the content" in this report.

**What is the validity of the defendant's claim (set forth in the defendants' counsel's letter of October 4, 2002 that "[i]ndeed, the single web page was buried deep in an Internet CMP database…"**

An Internet user could gain complete access to the Article by simply entering the following URL into their browser:

http://www.techweb.com/se/directlink.cgi?EET19970428S0008

There appears to be no technical difference between how the Article of the Plaintiff is stored compared to other articles that also appear to be retrievable through the same means – using the directlink.cgi script located on the CMP Media website.

The function of the database in which the Article is stored appears to be part of the core information infrastructure in how CMP Media publishes content generally to the Internet. With this point, I fail to understand what is meant by "buried deep". On hearing the statement, I would otherwise think that the article would be "difficult to access" rather than be so "easily displayed".

I would say that the "content" of the Article might be stored in a database. However, that database appears to be at the front door, with the door unlocked and wide open. It is easily queryable using *CGI* – a standard Internet technology used to connect web servers to non-Internet related data sources. There is no other apparent security to protect against unauthorized duplication of the Article, or any other CMP Media published content for that matter. Additionally, there is no complexity governing access to the database other than knowing the ID (id#: EET19970428S0008) assigned to the Article.

In summary, the Article apparently was readily accessible and stored in a database. The statement "buried deep in an Internet CMP database" seems to have no bearing on the discussion.

**What is the validity of the defendants' claim (set forth in defendants' counsel's letter of October 4, 2002) that "CMP has not profited" from the Article?**

My rationale likens the display of the Article, with all the advertisements, to a professional sporting event. The NBA, NFL, NHL, as prime examples, share a common basic advertising paradigm – the focus of the action. The focus for the audience, the sporting event, takes place in the center of the audience's view, while advertisements are portrayed on banners around the area of focus. Further, some advertisements so portrayed are dynamic, meaning that after a period of time, the spot where an advertisement is being displayed may cycle periodically through a set of different advertising sponsors.

The advertising model commonly used on the Internet is not much different. While the content of articles and information serve as the place of focus, the content within Internet documents being displayed is surrounded by advertisements.

Further, it is foundational to understand, when an Internet document, such as the Article, is presented to an Internet user, it is done so as "one object", complete, with both the content of the Article as well as the

**Janice Weinberg v. CMP Media Inc., et al**
**Civ. No. 302 CV1242 (JCH)**
**U.S. District Court, District of Connecticut**

advertisements. There is no separation; the advertisements are as much a part of the document sent to the Internet user as is the content of the Article.

The model for earning revenue through Internet advertising generally operates two ways, categorically. The first way is by "impression" or "ad view" – that is, a specific value or cost is assigned to an advertisement whenever it is completely presented in front of an Internet user. The second way is by "request" or "ad clickthrough" – that is, a specific value or cost is assigned to an advertisement whenever the Internet user "clicks" on the advertisement banner, such as to request more information about the advertisement.

It should be understood; rotating advertisement banners have potential to increase revenue. The longer a user stays on an Internet document having advertisement banners, the more ad impressions can be presented in front of the user. This rotating banner methodology is especially useful for Internet documents that take a long time to read, or are designed in such a way so as to entice the user to spend a long time on the document.

CMP Media appears to have an advertising model that fits into a paradigm for "ad impressions" mentioned above. According to Exhibit N, they use a combination of dimensions within an Internet document to target degrees of earning potential through Internet advertising. Per Exhibit N, CMP Media adjusts revenue earning based on:

1) Position of the advertisement in the Internet document. For example, an advertising banner at the top of an Internet document they publish earns more than any other type of advertisement they display on their Internet publications.

2) A concept called CPM – Cost Per Thousand ("M" = 1000, defined from Roman Numerals). By example, using Exhibit N, for every one-thousand "Banner #1 Cisco advertisement" they displayed, if the number of times the advertisement was displayed to Internet users over the course of the month was less than 249,000, CMP Media would bill the advertiser (Cisco) $100 for every 1,000 times the banner "Banner #1 Cisco advertisement" displayed during the month.

It should be noted that the CPM rates are different depending on the position of the advertisement within the Internet document, as well as possible contract options, such as the length of time an advertiser uses CMP Media as an advertisement platform for a particular advertisement campaign.

Per Exhibit N, CMP Media appears to use an "ad impression" model for earning revenue from advertisements. From their published pricing structure in Exhibit N, it is apparent that they are fully aware that advertisements are directly related to the content they display on their Internet web site, having a cost structure based on relative placement of advertisements on an Internet document. They seem to understand well that Internet documents contain regions that are of higher value for advertisements than others. Further, they do not appear to have an advertisement structure for displaying of ads independently of Internet document content – such as a full-page advertisement separate and distinct from article content.

For the claim that they "did not profit" from the Article to be true, every time the Article of the plaintiff displayed on the CMP Media website, no advertisements should have displayed, or revenues earned should have been subtracted from monthly earnings. However, according to Exhibits C-1 and affidavit Exhibits D, E, K, advertisement impressions were made every time the Article was displayed - Exhibit C-1 and D both specifically indicate the display of three advertisement impressions per viewing of the Article.

CMP Media also is able to track ad impressions very accurately. In Exhibit C-2, it is readily apparent they use a method that may assist in the monitoring of the number of times an advertisement displays in the document that makes up the totality of the Article. For example, the banner at the top of Exhibit C-1 corresponds to a uniquely named image file called "MobileBusines468.gif", located in the following code from Exhibit C-2:

Janice Weinberg v. CMP Media Inc., et al
Civ. No. 302 CV1242 (JCH)
U.S. District Court, District of Connecticut

```
<img src="http://img.cmpnet.com/ads/graphics/cs/dc/MobileBusiness468.gif" border=1 alt="Click Here!">
```

Assuming they capture visits to their web servers using *web server log files*, CMP Media could easily count the number of times that exact file having a unique name was displayed as an image in front of all Internet users visiting their website, and then do some simple math to accurately bill the advertiser.

Another method CMP Media uses to track advertisement impressions is by using a 3rd party service that specializes in the technologies of displaying and tracking the use of advertisements on Internet websites. The service is located at www.doubleclick.com. Their focus specifically is to "offer industry standard ad management and serving solutions for marketers, agencies and web publishers, streamlining the online advertising process and minimizing data discrepancies." (www.doubleclick.com, "Online Advertising", June 8, 2003).

The specifics of CMP Media's use of the service to track advertisements is mentioned again in Exhibit C-2. In Exhibit C-1, there is a 3Com advertisement displayed to the right of the Article. This advertisement corresponds to a section of code, mentioned in Exhibit C-2, that is responsible for display of the advertisement as follows:

```
<img src="http://m.doubleclick.net/viewad/636538-3complusblur_uk.gif" border=0 width=468 height=60 alt="Click here to find out more!">
```

What happens, before the document (the Article) is completely displayed to the Internet user, the web server makes a request to the server located at "m.doubleclick.net" for the advertisement document called "/viewad/636538-3complusblur_uk.gif". Once the advertisement document, the 3Com graphic image, is received from "m.doubleclick.net", the document that contains the Article is completely assembled and displayed to the user. What is seen is the result displayed in Exhibit C-1.

Further, as part of the service offering, www.doubleclick.com records the statistics of the number of times the advertisement document was requested on behalf of the customer, in this case – CMP Media. From those numbers, CMP Media can bill their advertisers accurately.

Likewise, the section of code that displays the Oracle advertisement, to the left in Exhibit C-1, is seen in Exhibit C-2 as the following section of code:

```
<img src=http://m.doubleclick.net/viewad/346009-think9iport_125x125k_3lp.gif border=0 width=125 height=125 alt="Click here to find out more!">
```

In Exhibit C-1, advertisements for "Mobile Business", "3Com" and "Oracle" are visible. However, in Exhibit D, it was stated that advertisements for "Verisign", "Rational" and "EMC" were displayed. Suffice to say, ad impressions were successfully made for each affiant who viewed the Article each time, and possibly other Internet users who may also have visited the Article on the CMP Media website over the years.

The ad impression model implemented by CMP Media allows them to track the number of times advertisement images are displayed to Internet users. Further, the number of times advertisement images display in front of users generates revenues based on a very specific pricing structure in Exhibit-N. Each time each affiant saw the Article, they saw advertisement images (received advertisement impressions).

As such, the claim that "CMP has not profited" from the Article would only be true if no one ever viewed the Article.

## VI. EXHIBITS

Exh. A: A table describing the text and images adjacent to the first page of the Article, as obtained in print, digital and affidavit evidence.

Exh. B: The initial page of each copy of the Article described in Exhibit A.

Exh. C-1: The screen shot of the Article, taken on July 10, 2001.

Exh. C-2: The source code for the Article, downloaded on July 10, 2001.

Exh. D: Judith Elmendorf's June 12, 2001 affidavit.

Exh. E: Edwin H. Fraumann's January 30, 2003 affidavit.

Exh. F: A web page displaying TechWeb content, which was obtained after the Article was removed by clicking on the hyperlink at a Galaxy Management Group website.

Exh. G: Judith Elmendorf's January 3, 2002 affidavit.

Exh. H: Archive.org summary and detail pages reflecting visits it made to websites at the following addresses:

    (a) bway.net/galaxy/hotlist.htm, a website operated by Galaxy Management Group.

    (b) galaxymgt.com, another website operated by Galaxy Management Group.

    (c) wood-west.com, a website operated by Wood West & Partners.

Exh. I-1: A printout of the website with the address bway.net/galaxy/hotlist.htm
I-2: A screen shot of the same website

Exh. J-1: Changes noted by archive.org when it visited the website with the address bway.net/galaxy/hotlist.htm.

Exh. J-2: Changes noted by archive.org during its visits to the website page with the address galaxymgt.com/CFPages/CareerStrategies.cfm.

Exh. J-3: Changes noted by archive.org when it visited the website page with the address wood-west.com/news.htm

Exh. K: Moses Reynolds's Affidavit of February 6, 2003.

| | |
|---|---|
| Exh. L: | A timeline of archive.org evidence, other evidence and witness claims for the period May 15, 1998-Feb. 9, 2002. |
| Exh. M: | A copy of the Article, downloaded on September 25, 1997. |
| Exh. N: | TechWeb advertising rates, as published in SRDS. |
| Exh. O: | CMPNet Advertising Specifications. |